UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANTHONY BENTO, | Civil Action No. _____ |
| Plaintiff, | |
| v. | |
| THE ALUMINUM FINISHING COMPANY, INC, | JURY TRIAL DEMANDED |
| Defendant. | |

**COMPLAINT**

## I. INTRODUCTION

1. Plaintiff/ Anthony Bento (hereinafter "Plaintiff") brings this action against The Aluminum Finishing Company, Inc. (hereinafter "Defendant" or "AFC"), for retaliation under 1) the False Claims Act, 31 U.S.C. §3729, *et. seq.* ("FCA"), 2) the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. §42-110b, *et seq.* ("CUTPA"), and 3) the Connecticut Constitution, Conn. Gen. Stat. §31–51q, as well as claims for 4) fraudulent and 5) negligent misrepresentation/inducement.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. §1331. With respect to the state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 in that the state law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

3. Venue is appropriate in the District of Connecticut pursuant to 28 U.S.C. §1391(b), because Defendant's principal place of business is in this district. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in this

judicial district.

### III. PARTIES

4. Plaintiff is a resident of Trumbull, Connecticut.

5. The Aluminum Finishing Company, Inc. ("AFC" or "Defendant") is a private Bridgeport, Connecticut corporation owned by Edward Sivri ("Mr. Sivri"), in the business of providing metal finishing services to the aerospace and weapons manufacturing industries.

6. Defendant either enters into contracts with the Government directly or enters into contracts as a subcontractor for companies that have Government contracts.

7. Defendant was all relevant times engaged in trade or commerce, within the meaning of Conn.Gen.Stat. §42-110b.

### IV. STATEMENT OF FACTS

8. In 2012, Plaintiff retired and moved from Connecticut to Florida.

9. After moving to Florida, Plaintiff developed a friendship with Edward Sivri, owner of AFC.

10. Mr. Sivri would frequently discuss matters relating to his business with Plaintiff.

11. In or about late winter, 2015, Mr. Sivri discussed with Plaintiff his recent discovery that AFC's General Manager Duane Bass had been misappropriating company funds over a period of several years, totaling between $350,000 and $500,000.

12. In or about April, 2015, Mr. Sivri terminated Duane Bass and hired Michael Daily ("Mr. Daily") as AFC's new General Manager.

13. As General Manager, Mr. Dailey called Mr. Sivri every Friday afternoon to fill him in about what had happened at the company over the week.

14. In or about the spring of 2016, Mr. Sivri told Plaintiff that the company had recouped between $280,000 and $325,000 of the money Duane Bass had misappropriated.

15. Plaintiff asked what Mr. Sivri planned to do with that money, to which Mr. Sivri responded that he intended to return it to the company, "where it belong[ed]".

16. In or about July, 2017, Mr. Sivri told Plaintiff that he had just discovered Mr. Daily had been misusing company funds for expensive and unnecessary building repairs and improvements, including a security camera system that cost several thousand dollars and a storage room converted to a conference office that was not needed.

17. Mr. Sivri told Plaintiff that since his discovery of Duane Bass' misappropriations in 2015, he and his accountant had kept very close attention to the company's finances. Mr. Sivri said that he had many emails and documents from his accountant showing the company's expenses and finances.

18. In or about July, 2017, Plaintiff asked Mr. Sivri about the company's current the financial condition.

19. Mr. Sivri responded by saying that the company was still "fine", and that there was money in the company bank account and CD's.

20. In or about July, 2017, Mr. Sivri asked Plaintiff to take over management of AFC as Chief Financial Officer, visiting Connecticut once every three months for a week or two, at a salary of $45,000 a year.

21. Plaintiff was interested in the position. However, he did not think the business could be properly run on a remote basis, going back and forth to Connecticut a few times a year.

22. Plaintiff asked Mr. Sivri again about the company's finances. Again, he was told that the company was "doing fine". Specifically, Mr. Sivri said that AFC had been generating annual income of $3.2 million for each of the last ten years, and that the company, "basically runs itself".

23. About one week later, Plaintiff offered to return to Connecticut on a full-time basis to run the company as CFO.

24. Plaintiff offered to work at a reduced starting salary of $92,000, as a gesture of good will. The former General Manager had been paid $150,000 annually, but Plaintiff wanted to help reduce the company's annual labor costs.

25. Plaintiff and Mr. Sivri agreed that Plaintiff would rent an apartment in Connecticut until he was able to sell his home in Florida, at which time he would purchase a residence in Connecticut.

26. Again, Plaintiff asked Mr. Sivri for details about AFC's current finances.

27. Based on what Mr. Sivri had told him, Plaintiff believed that the company had over $1 million in its bank account as of April, 2015. When Plaintiff asked what had become of this money, Mr. Sivri told him that Michael Daily had used a portion to make repairs, and had put the remainder into, "7 to 9 CD's in the company account, with $100,000 in each", and that an additional sum of at least $280,000 had been recovered from Duane Bass and placed back into the company checking account in 2016.

28. Mr. Sivri told Plaintiff that most of this money was still in the company, and said, "the company is still on track for $3,200,000 annual income."

29. Because Plaintiff had been told that as owner of the company, Mr. Sivri was receiving financial reports from his accountant on a regular basis, Plaintiff had no reason to doubt Mr. Sivri's statements about AFC's current financial status.

30. However, in order to be sure, Plaintiff asked Mr. Sivri to confirm that the company's finances were sound. Again, Mr. Sivri told Plaintiff that the business was "doing great", that it "runs itself", and that all Plaintiff would have to do was to oversee it.

31. During July and August, 2017, Mr. Sivri assured Plaintiff numerous times that,

"the company is very sound", and that, "it runs itself". Specifically, Mr. Sivri stated that AFC, "has earned $3.2 million per year for the last fifteen years," and is, "very profitable".

32. Mr. Sivri also assured Plaintiff that, he "[wouldn't] have to go in every day" if he accepted the position.

33. Feeling confident in Mr. Sivri's statements regarding the company's finances, Plaintiff relied on Mr. Sivri's representations, accepted the position and put his house in Florida up for sale in August, 2017.

34. In late September, 2017, Plaintiff moved to Connecticut and rented an apartment and furniture, at a cost of about $2,300 per month.

35. Plaintiff was still paying approximately $2,000 per month to maintain his home in Florida, which had not yet sold.

36. On Thursday morning, September 28, 2017, Plaintiff and Mr. Sivri arrived at AFC and met with Michael Dailey to discuss the state of the company.

37. Their visit was a surprise to Mr. Dailey. His speech was very slurred and Plaintiff found it difficult to understand what he was saying.

38. Mr. Dailey seemed to be under the influence of narcotics.

39. Overall, Mr. Dailey was unable to provide much useful information. However, he did mention that one of the managers, Lilly Tobin ("Ms. Tobin"), had been altering and falsifying test results on Nadcap forms for years.

40. Because of Mr. Dailey's compromised state, Plaintiff did not put much weight on his accusation.

41. As an aluminum parts supplier to government aerospace contractors, AFC is regulated by the National Aerospace and Defense Contractors Accreditation Program ("Nadcap"), a global cooperative accreditation program for aerospace, engineering, defense and related

industries. The Nadcap program is administered by the Performance Review Institute ("PRI"). Through PRI, Nadcap provides independent certification of manufacturing processes for the industry.

42. PRI schedules audits and assigns industry approved Nadcap auditors to conduct the audits using an industry agreed checklist. Anodization, passivation and salt spray testing is done on a monthly basis to ensure that the company's aluminum products are able to withstand corrosion. The company's chemical process is also tested to be sure all tanks comply with strict specifications.

43. If a Nadcap regulated company fails any monthly test, it is obligated to inform PRI and each of its aerospace customers that any and all parts the company treated during that time period might not have been processed properly.

44. At the end of the meeting, Mr. Sivri terminated Mr. Dailey.

45. Later that day, Plaintiff and Mr. Sivri met with each of AFC's managers and explained that Plaintiff would be taking over as Chief Financial Officer and General Manager.

46. When questioned about Mr. Dailey's accusation, Ms. Tobin denied ever having altered any test results in Nadcap paperwork.

47. The same day, Mr. Dailey was removed as signer from the company bank account, and replaced by Plaintiff and Mr. Sivri.

48. Later that afternoon, Mr. Sivri left to return to Florida.

49. Monday, October 2, 2017, was Plaintiff's first full day of work.

50. Accounts Payable Manager, Jerry McGee ("Ms. McGee"), presented Plaintiff with several bounced checks and asked what she should do with them.

51. When Plaintiff asked why the checks had bounced, Ms. McGee explained that there was almost no money in the company's bank account, and that over $125,000 was still owed

to contractors for work done on the building in 2016 and 2017.

52. Ms. McGee then said, "we also owe about $50,000 to companies like Staples," and, "many want to put us on a COD basis, and a few have already".

53. Plaintiff was shocked, considering what Mr. Sivri had told him about the company's finances. Plaintiff had been told that AFC was currently bringing in revenues averaging approximately $61,500 per week.

54. However, during Plaintiff's first week, when he was able to access the company's bank records, he discovered that it currently contained only about $7,000, meaning that it was on the brink of insolvency.

55. Ms. McGee then told Plaintiff that about $40,000 was still needed to fund payroll in less than two days.

56. Within one week, Plaintiff managed to secure the funds the company needed to cover payroll and to cover the $35,000 in bounced checks.

57. On October 3, 2017, Plaintiff reviewed the company's banking records for the past four years. Of the over $1 million in the company's accounts as of April, 2015, only $40,000 remained in one small CD.

58. With the company's annual revenues and the $1,000,000 in CD accounts, Mr. Dailey had spent almost $9,000,000 during the two and a half years that he had run the company.

59. The balance in the company's bank account had dipped below zero on numerous occasions, including once during the summer of 2017, when it was overdrawn by $100k.

60. Despite Plaintiff's numerous inquiries about the company's financial condition during the summer of 2017, Mr. Sivri had deliberately misrepresented the company's financial state.

61. Plaintiff discovered that instead of leaving the approximately $280,000 recovered from Duane Bass in the company account, Mr. Sivri had removed that money for his own personal use in the summer of 2017, immediately before Plaintiff had begun working there. Within days, the company's bank account had gone into the red.

62. Plaintiff was extremely shocked and upset by this realization. He had changed his whole life plan, selling his final retirement home to move to Connecticut to run what he had been told was a profitable company.

63. In truth, as Plaintiff made very clear to Mr. Sivri, AFC would have gone bankrupt within a week or two if Plaintiff had not arrived in September, 2017.

64. Mr. Sivri did not appear to be surprised when, about a week later, Plaintiff confronted him about the company's shockingly poor financial state.

65. In addition to the company's terrible financial state, Plaintiff discovered numerous serious unaddressed safety concerns throughout the 20,000 square foot shop, that would cost hundreds of thousands of dollars to fix.

66. Some repairs had been started, but never finished.

67. There were numerous severely hazardous areas on the shop floor, where there were leaking tanks, leaking pipes and a leaking roof. Rain, tank and waste water lay in pools very near 120V and 220V electrical outlets, presenting a serious danger of deadly electrocution.

68. Part of the raised wooden floor next to some tanks containing acid was on the verge of collapse, and would cost approximately $100,000 to repair.

69. The hazard presented an extreme danger to workers who could be maimed or killed.

70. In fact, a few years prior, a worker had been injured when he had fallen into a tank, after which he was unable to work for over 2 years.

71. When Mr. Sivri told Plaintiff that Mr. Dailey had completed these repairs, he was fully aware that the repairs had not in fact been completed.

72. If Plaintiff had known the true financial and physical condition of The Aluminum Finishing Company, he would never have accepted the position as CFO and General Manager.

73. Mr. Sivri deliberately misrepresented facts regarding the company's condition in order to induce Plaintiff into accepting the position.

74. In or about December, 2017, Mr. Sivri raised Plaintiff's annual salary to $117,000.

75. AFC's annual Nadcap audit was scheduled for June 4 through June 6, 2018.

76. On June 2, 2018, Nadcap Manager Ahmed Sahley suddenly resigned without explanation.

77. Two other managers, Lilly Tobin and Todd Thomas ("Mr. Thomas"), took over and prepared the necessary documents to work with the auditor.

78. Ms. Tobin and Mr. Thomas advised Plaintiff to stay in his office in case the auditor had any technical questions.

79. Since both Ms. Tobin and Mr. Thomas were long-time trusted employees, Plaintiff agreed to let them handle the audit without interfering.

80. AFC passed the annual audit.

81. In or about October, 2018, Mr. Sivri raised Plaintiff's annual salary again, to $125,000.

82. In late January, 2019, two Nadcap auditors arrived again, this time unexpectedly, requesting all of the company's monthly salt spray test results and paperwork from 2018.

83. The two Nadcap managers, Ms. Tobin and Mr. Thomas, and chemicals manager Josh Danis, told the two inspectors that they could not find the test results for the two months in 2018 that were in question.

84. Plaintiff said nothing during the meeting with the inspectors, but suddenly began to realize that something was very wrong at the company.

85. The two auditors then said that they were aware the company had been using improper aluminum test panels and had failed its salt spray tests in August and November of 2018. It was finally agreed the test panels AFC had been using were correct for 80% of the parts it received from suppliers. However, no one at the company was able to provide any legitimate reason why the August 2018 and November 2018 test results were missing.

86. AFC had failed to inform its aerospace contractors, as required, that the parts sent had not passed anodizing and passivation tests, and were therefore noncompliant and should not be used.

87. Instead, signed certificates of compliance with Nadcap military specifications had gone out with all parts sent to aerospace contractors during this time period.

88. This was the first time Plaintiff learned of the problem from a credible source.

89. From the time Plaintiff began at AFC, he had held weekly managers meetings during which each manager was given an opportunity to discuss any problems in his or her department. No one had ever brought up any problem with the company's monthly aluminum panel testing. As a result, Plaintiff had been under the impression that the company had thus far met all Nadcap requirements.

90. At these meetings, Plaintiff had also asked the shop managers about tank fluid levels, and he was told the correct tank levels and chemical additions had been settled on years before he started working at the company and that there was no need to change them.

91. Based on these assurances, and the fact that no one had disclosed to Plaintiff that the company had failed its monthly tets, he had had no reason to suspect there was a problem.

92. The auditors then listed the additional tests and regulations that the company was

required to followand said that they would be informing the company of their findings soon.

93.    Shop Manager and Nadcap Manager, Todd Thomas, said that he would investigate the issue.

94.    The next day, Plaintiff met with the three Nadcap experts, Todd Thomas, Lilly Tobin and Efrain Vega.

95.    During this meeting, Plaintiff learned that managers had been forging documents and altering AFC's monthly test results on a regular basis.

96.    The Nadcap managers told Plaintiff that Mr. Sivri had been aware of the forgeries all along, and that the forgeries had taken place with his explicit approval.  Plaintiff was told by long-time workers they had done what needed to pass the tests, and that this had been going on for years, with the knowledge and approval of each of the previous general managers as well as the owner.

97.    The Nadcap managers said that Mr. Dailey had followed Mr. Sivri's instruction to do what "had to be done" by altering test results in order to pass Nadcap audits and keep the company's accreditation.

98.    AFC's managers had not had enough time to alter the company's 2018 test results prior to the Nadcap auditors' unexpected visit in January, 2019.  As a result, it was revealed that AFC had failed two test periods and had not informed Plaintiff.

99.    As required by PRI, AFC then informed all of its aerospace contract customers that the company had failed a Nadcap audit, lost accreditation and could not do aerospace work until it passed a mini audit, which was scheduled for June 13, 2019.

100.   Plaintiff was told that if AFC passed the June 13, 2019 mini audit, the company could continue treating aerospace parts until its August, 2019 annual audit.

101.   Plaintiff told the Nadcap team that they needed to work to get the company's

Nadcap accreditation back legitimately.

102. A few days later, Plaintiff assigned three of the company's brightest employees to help the current managers run the Nadcap department; 1) Shop and Quality Manager Jay Grajalez; 2) Chemicals and Wastewater Manager Josh Danis; and 3) Shipping Office Assistant Manager Tomo Danis.

103. Plaintiff held a meeting during which he instructed the Nadcap managers to study every aspect of Nadcap in order to make sure the company could legitimately pass the audits. Plaintiff warned them that there would be repercussions, including termination and possible jail sentences, if there was any more fraudulent activity.

104. Plaintiff met with the new team of Nadcap managers at least three times a week to review what they had been learning about the Nadcap process.

105. In addition, Plaintiff called Mr. Sivri and told him that the staff had been forging test results over a period of many years in order to keep the company's Nadcap accreditation. He explained the actions he was taking to make sure this wouldn't happen in the future.

106. Mr. Sivri questioned whether the new managers would be able to find a way to pass the Nadcap audits without altering test results. He said, "AFC does great work with the same $3,2000,000 business every year. You cannot lose Nadcap. Let your people do what they have to do, and don't worry about it".

107. Plaintiff told Mr. Sivri that AFC needed to pass the audits legitimately, and that he would never cheat or forge any Nadcap tests or documents. Mr. Sivri did not respond.

108. Plaintiff then told Mr. Sivri that such activities could subject him to arrest, fine or jail. Again, Mr. Sivri did not respond.

109. After the call, Plaintiff sent Mr. Sivri a text message reiterating what he had said during the conversation, but Mr. Sivri did not respond.

110. In late February, 2019, AFC was informed that its Nadcap affiliation and license had been withdrawn.

111. This meant that the company could no longer treat parts for Sikorsky Aerospace, which comprised at least 40 percent of its business.

112. AFC could not afford to wait until the next annual audit in August, 2019 to restart its Nadcap compliant work.

113. After an hour-long conference call in early March, 2019, the Nadcap auditors agreed to place the company on suspension rather than withdrawal, and schedule a "mini audit" for June 13, 2019. If the company then passed, its Nadcap work would only have been put on hold for about three months.

114. In late March, 2019, Todd Thomas ("Mr. Thomas") suddenly walked off the job without explanation.

115. Two days later, Mr. Thomas officially resigned, without giving any reason. Plaintiff tried calling, texting and emailing him, but he did not respond.

116. Plaintiff could not understand this sudden departure.

117. Mr. Thomas had worked at the company for about seven years. In June, 2018, Plaintiff had promoted him, raised his annual salary from $60,000 to $80,000, given him additional days off with pay, and allowed him to leave early when he wanted to.

118. After Mr. Thomas left, Lilly Tobin became the company's Nadcap leader. Ms. Tobin had been assisting with Nadcap audits for over ten years and understood what was required for the company to pass an audit.

119. In April 2019, the company again failed one salt spray test.

120. When he found out the company had failed, Production Manager and employee of 19 years, Efrain Vega, suddenly resigned from his position.

121.  Then, in late May, 2019, Office Manager, Lilly Tobin also resigned.

122.  With the resignation of all three experienced Nadcap managers and their replacements having only two weeks of experience, Plaintiff did not believe that the company would be able pass the mini audit which was just three weeks away.  Plaintiff knew that this would be the company's first legitimate test, and if they failed, it would set the company back years.

123.  Plaintiff called PRI and explained that extra time was needed.

124.  A annual mini audit date was set for October, 2019, which allowed the three new Nadcap managers enough time to figure out how to pass the tests legitimately.

125.  On numerous occasions during the course of Plaintiff's employment, Mr. Sivri told Plaintiff that he thought the company would have closed within days if he had not arrived on September 17, 2017.

126.  In July, 2019, Plaintiff again texted Mr. Sivri and reminded him that the company would have closed if he had not arrived when he did.  Mr. Sivri agreed.

127.  In July, 2019, Plaintiff told Mr. Sivri the details of his plan to get the company's Nadcap certification back without forging or altering any test results, to which Mr. Sivri replied, "good".

128.  Then, on Monday, July 29, 2019, Mr. Sivri texted Plaintiff to say that he was, "going to take over the company".  Plaintiff called and texted Mr. Sivri numerous times, but he did not respond.

129.  On August 1, 2019, Plaintiff received a text from Mr. Sivri saying that he would be returning to the company on August 6th.  The text continued, "Monday August 5 will be your last day. I will tell people you retired.  No need to meet."  "That site would make a great car dealership". .

130.  Plaintiff texted back, telling Mr. Sivri that he would not lie to the workers, who he

had come to consider friends.

131. Mr. Sivri responded by telling Plaintiff to leave, and threatening to call the police.

132. Within 10 minutes of Mr. Sivri's text, five police cars arrived at the building.

133. Plaintiff left immediately.

134. Due to Plaintiff's efforts, AFC was finally able to pass the Nadcap audit legitimately in or about October, 2019, with the three employees chosen by Plaintiff to run Nadcap.

135. Plaintiff was terminated in retaliation for refusing to participate AFC's fraudulent activities.

## V.   COUNT ONE:   RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT,  31 U.S.C. § 3730(h)

136. Paragraphs 1-135 are incorporated by reference herein.

137. Pursuant to 31 U.S.C. § 3730(h) of the False Claims Act (hereinafter "FCA"), any employee who is discharged, demoted, suspended, threatened, harassed and otherwise discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done under the FCA is entitled to all relief necessary to make the employee whole.

138. Plaintiff engaged in protected activity, "in furtherance of an action under [the FCA]" by reporting and objecting to the submission of forged salt spray test results to Nadcap, an agency tasked with monitoring compliance with governmental aerospace contracts.

139. Plaintiff believed in good faith, and a reasonable employee in the same or similar circumstances would also believe, that Defendant was committing a fraud upon federal government agencies and other private entities.

140. In July, 2019, when Plaintiff refused to participate in continued regulatory violations, Defendant responded by immediately terminating his employment.

141. Plaintiff's employment was terminated because of his participation in reporting Defendants' ongoing violations of the Nadcap regulations.

142. Defendant knowingly retaliated against Plaintiff for his refusal to partake in the fraudulent applications/attestations for Government monies.

143. Plaintiff was terminated for reasons contrary to public policy, as set out in 31 U.S.C. § 3730(h), and without just cause.

144. As a result, Plaintiff was harmed and continues to be harmed in that he has suffered economic loss, damage to his professional reputation, and emotional distress.

145. Plaintiff respectfully requests that Defendant be held liable on this claim and requests all appropriate relief be awarded in his favor.

## VII. COUNT TWO: VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT, § 42–110g

146. Paragraphs 1-145 are incorporated by reference herein.

147. Pursuant to the Connecticut Unfair Trade Practices Act (CUTPA), "[a]ny person who suffers any ascertainable loss of money or property", as a result of the use or employment of "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," is entitled to bring an action to recover damages, C.G.S.A. § 42-110 100b(a) and (d), and g(a).

148. Defendant violated CUTPA by terminating Plaintiff for trying to stop the forgery of test results submitted to Nadcap.

149. Defendant's unfair, immoral, unethical, oppressive and unscrupulous acts, as described above, resulted in substantial injury to Plaintiff.

150.   Plaintiff respectfully requests that Defendant be held liable on this claim and requests all appropriate relief be awarded in his favor.

### VIII.   COUNT THREE:   RETALIATION FOR PROTECTED SPEECH UNDER THE CONNECTICUT CONSTITUTION, § 31–51q

151.   Paragraphs 1-150 are incorporated by reference herein.

152.   Pursuant to the Connecticut Constitution, an employee who is disciplined or discharged for exercising his right to protected speech is entitled to bring an action for damages against his employer, Conn.Gen.Stat. § 31–51q.

153.   Plaintiff engaged in constitutionally protected speech by complaining about and refusing to participate in the submission of forged test results to Nadcap, a matter of public concern.

154.   Defendant took adverse action against Plaintiff by terminating him without any legitimate reason or cause.

155.   Plaintiff's employment was terminated because he spoke out about Defendant's fraudulent activity.

156.   As a result, Plaintiff was harmed and continues to be harmed in that he has suffered economic loss, damage to his professional reputation, and emotional distress.

157.   Plaintiff respectfully requests that Defendant be held liable on this claim and requests all appropriate relief be awarded in his favor.

### IX.   COUNT FOUR:   FRAUDULENT MISREPRESENTATION/ INDUCEMENT

158.   Paragraphs 1-157 are incorporated by reference herein.

159.   Defendant's financial status was fraudulently misrepresented to Plaintiff for the purpose of inducing him into accepting a position as Chief Financial Officer and General Manager.

160. During the summer of 2017, Mr. Sivri made numerous false representations about AFC's current finances. He told Plaintiff that the company, was "doing great", that it was "very sound", "very profitable", and that it, "runs itself". He specifically stated that AFC "ha[d] earned $3.2 million per year for the last fifteen years". Mr. Sivri further told Plaintiff that as of April, 2015, the company had over $1 million in its bank account, and that a portion of that money had gone to repairs, and the remainder had been put into "7 to 9 CD's in the company account, with $100,000 in each. " He said that an additional sum of at least $280,000 had been placed in the account in 2016, that most of this money remained there, and the "the company [wa]s still on track for $3,200,000 annual income."

161. Mr. Sivri knew such statements to be untrue at the time he made them. As owner of the company, he received regular statements detailing the company's finances.

162. Mr. Sivri's false statements were made for no other purpose than to induce Plaintiff into accepting the position as Chief Financial Officer and General Manager.

163. Based on what he had been told about AFC's financials, Plaintiff felt confident that he would be running a successful company where he would be able to profit. Relying on what Mr. Sivri had told him, he accepted the position as CFO and General Manager and relocated to Connecticut.

164. As a result of Defendant's deliberate misrepresentations, Plaintiff suffered pecuniary harm due to the loss of his retirement home and moving costs and expenses incurred totaling over $2,300 per month.

165. Plaintiff respectfully requests that Defendant be held liable on this claim and requests all appropriate relief be awarded in his favor.

X.     COUNT FIVE:     NEGLIGENT MISREPRESENTATION/ INDUCEMENT

166. Paragraphs 1-165 are incorporated by reference herein.

167. Defendant negligently misrepresented AFC's financial state to Plaintiff.

168. During the summer of 2017, Mr. Sivri made numerous false representations about AFC's current finances. He told Plaintiff that the company, was "doing great", that it was "very sound", "very profitable", and that it, "runs itself". He specifically stated that AFC "ha[d] earned $3.2 million per year for the last fifteen years". Mr. Sivri further told Plaintiff that as of April, 2015, the company had over $1 million in its bank account, and that a portion of that money had gone to repairs, and the remainder had been put into "7 to 9 CD's in the company account, with $100,000 in each. " He said that an additional sum of at least $280,000 had been placed in the account in 2016, that most of this money remained there, and the "the company [wa]s still on track for $3,200,000 annual income."

169. Mr. Sivri knew or should have known that such statements were untrue. As owner of the company, he received regular statements detailing the company's finances.

170. Plaintiff justifiably relied on misrepresentations made by Mr. Sivri when he accepted the position as CFO and General Manager

171. As a result of Defendant's deliberate misrepresentations, Plaintiff suffered pecuniary harm due to the loss of his retirement home and moving costs and expenses incurred totaling over $2,300 per month.

172. Plaintiff respectfully requests that Defendant be held liable on this claim and requests all appropriate relief be awarded in his favor.

XI. **DEMAND FOR RELIEF**

Plaintiff hereby requests the following relief:

A. Award compensatory damages;

B. Award punitive damages;

C. Award attorneys' fees and costs;

D. Award pre-judgement interest;

E. Award post-judgement interest;

F. Award such other relief in law or equity as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff respectfully requests a jury trial on all questions of fact raised by his Complaint.

>
> Respectfully Submitted,
> PLAINTIFF
> ANTHONY BENTO
>
> /s/_____
> Jill Saluck (ct30331)
> Saluck, Halper & Lehrman PLLC
> 75 S. Broadway, Suite 400
> White Plains, NY 10601
> tel. (914)246-2686
> jsaluck@employ-law.com